Andre Hankton We'll hear first from Megan Bethune. You know your time limitations. We ask that you please observe them and bring your argument to a close when you see the red light.  May it please the court. My name is Megan Bethune and I represent Telly Hankton in this appeal. The assignments of error in Telly Hankton's original appeal trace back to a foundational mismatch in the tools available to the parties for the presentation of their case at trial. On the one hand, the government was able to paint with a broad brush in this case. By virtue of the RICO conspiracy indictment, the government was able to bring in all kinds of evidence against Telly Hankton that ordinarily wouldn't be admissible at trial against a singular defendant. And on the other hand, the tools available to Telly Hankton for the presentation of his case, primarily that of cross-examination, was blunted and limited in several critical ways by the district court. And I'd like to take my time today to focus on just one of those limitations which was imposed by the district court in this case. And that is the admission of prior testimonial statements of Hassan Williams, which was testimony, which was statements admitted against Telly Hankton, prior unconfronted testimony, admitted under the doctrine of forfeiture by wrongdoing, the exception to the Sixth Amendment confrontation clause. So under the forfeiture by wrongdoing standard, the government has to prove that the defendant wrongfully caused or acquiesced in wrongfully causing the unavailability of the declarant and did so, the unavailability of the declarant as a witness and did so intending that result. And the government's evidence here failed on both counts. Now the government came forward prior to trial and said, Telly Hankton has forfeited his confrontation rights because he had something to do with the death of Hassan Williams, who was killed by Walter Porter nine days after Hassan Williams' testimony to a grand jury. And the statements at issue that were admitted at trial are statements by Hassan Williams to police and in grand jury testimony where he identifies and says, I saw Telly Hankton at the scene of the Jesse Reed homicide. I saw Telly Hankton shoot Jesse Reed. So the government comes forward prior to trial and shows what is its evidence that this forfeiture by wrongdoing standard has been met. So counsel, the district court has to find by preponderance of the evidence that there was wrongdoing, right? I mean, are we reviewing this for clear error, fact findings of the district court or another standard? Yes. Well, we are alleging primarily that the district court's primary error here is that there was not sufficient evidence under preponderance by the evidence standard. And we do also in our brief argue that it's possible that this standard should be higher because we're talking about depriving a defendant of his Sixth Amendment trial rights. What's your best case for the idea that the preponderance of the evidence is not the right standard? We base our argument that it should be maybe clear and convincing. That's based on, it is an unpublished opinion from the Fifth Circuit that does note that, you know, when you're dealing with confrontation rights, that the standard of evidence might be higher. You're talking about the Nelson case? That's right. Sorry, that's the Nelson case. But it's an unpublished case, and I thought in Nelson they just sort of questioned it. They didn't say that it should be. No, no. They didn't. But also, if you look to the language in Giles, I think there's language in Giles that talks about, it says, look, we're talking about a pretrial determination that you lose, you have forfeited your confrontation rights. So I think there is language that supports possibly holding the government to a higher standard in that case. But I do want to bring it back to the government's actual evidence that they put forward in this pretrial determination. What the government came forward with was essentially, they argued an oral argument, and the district court decided, this is at 4900 in the record, they said, okay, the content of Hassan Williams' statement is that he saw and recognized Telly Hankton at the Jesse Reed shooting. Therefore, Telly Hankton must have seen and recognized Hassan Williams. And it is from that. That's it. That's what they take. They take that and say, that somehow proves that Telly Hankton had something to do with the Hassan Williams homicide. Well, despite the fact that Telly Hankton was in jail at the time of the Hassan Williams homicide, he was not charged in that crime. It doesn't appear in the overt acts. It doesn't appear, they didn't bring this to the grand jury at all. And the government comes forward now, in the government's brief, they say, well, we did, we established that Telly Hankton forfeited his confrontation rights. We proved that Telly Hankton hired Walter Porter to kill Hassan Williams. And the government points to testimony at trial. And I first want to say that there's a due process issue with pointing to evidence at trial to say that it somehow retroactively justifies finding that Telly Hankton has forfeited his trial rights. Because if you look at Giles, Giles really concerns itself with, this is a pretrial determination. And by what measure do we have the government come forward with evidence? And what are the delineations of this exception to the confrontation clause? So there is a problem with pointing to evidence at trial. But in the time I have left, I do want to point, I want to talk about the evidence that the government put forth in its brief. The government says, okay, we've established that Telly Hankton hired Walter Porter to kill Hassan Williams. And it points to the testimony at trial of three witnesses. This is the testimony of Aaron Smith, Jared Feddesen, and Brian Hayes. And this is not independent testimony of anybody knowing anything about the killing of Hassan Williams. This is testimony from witnesses who are reiterating hearsay from Walter Porter. Walter Porter, a man who was barely competent to stand trial. And if we look at just these statements of Walter Porter, Walter Porter saying this, Walter Porter saying Telly Hankton hired me to do this and that, we can look at what the jury thought of statements of Walter Porter. Because the jury didn't, when you have statements of Walter Porter, hearsay, on their own, the jury typically did not believe that evidence. And you can look at counts 15 and 16 to see that, because Telly Hankton was exonerated on those counts. And I'll, I see that my time is running out, and I'll pick up on rebuttal. Thank you very much. All right, counsel. Thank you.  Yes, Your Honor. Sarah Ottinger. I'm Sarah Ottinger on behalf of Walter Porter. I'm going to address today the erroneous... Do you feel comfortable taking your mask off? Oh, yes, I do. I can hear you better. Believe it or not, I forgot. It's so comfortable now. Right? I would have noticed when I started not getting air. I'd like to address the erroneous finding of, the erroneous denial of funding for neuropsychological exam, and then if there's time severance. I'm probably going to speak pretty quickly, because the time is short. Stop me if it's too quickly. A different panel of this court reviewed the competency determination on appeal in a different case based on the same competency hearing. It upheld the finding of competence in that hearing, saying it would not engage on appeal in relitigating the battle of experts. But the battle did not occur on a level playing field. That was because the defense desperately needed funding to hire a neuropsychologist to perform neuropsychological testing, which was critical to its defense of incompetence. The defense was denied the funding to hire this expert. At the competency hearing, on the one hand, you had the government psychology with no expertise, the government psychologist with no expertise in neurology. He claimed Mr. Porter was malingering mental illness, and that his irrational communication patterns were within his control. On the other side, you had the defense neuropsychiatrist saying he needed neuropsychological testing, which for him was critical on the issue of malingering and voluntariness, those two issues Mr. Porter lost on. Would you start, though, with, I mean, you know the government's position on this. This is an issue we've already resolved, Fifth Circuit and the earlier appeal. Why isn't this argument foreclosed? This argument in terms of the funding for the neuropsychologist is not already foreclosed because in the other case, the court did not reach the issue. In the other case, the court found that this issue specifically was only preserved in this case, and that the motion hadn't been filed in the other case, and so it declined to reach the issue, and indeed, you know, ultimately found competence. But it's our contention that this was critical, critical to putting competence before the judge in this case, and that the funding should have been granted. Counsel, how, how do we demarcate between what's foreclosed and what's not foreclosed, though? I mean, I guess, to build on Judge Southwick's question, we're talking about something with the finding of competence, and the other findings that underlay that, I mean, those are, those are decided, right? Doesn't that dictate what the district court judge did here as far as the neuropsych evaluation too? No, Your Honor, I don't think it, it does. So clear that up for me, please. Okay, and specifically because the district court found that with respect to a mental disease or defect, Mr. Porter was malingering, and the district court found that his, his really impossible communication was a result of, was a voluntary thing on his part. He was trying to throw the test, basically, right? So on the false symptoms, yes, that, that's what malingering is. Malingering is faking something for your benefit. And so that's what the government found. What the defense expert, the neuropsychiatrist was saying, those symptoms that sometimes, you know, indicate traditionally malingering of psychosis, when you look at the, at, at neurology and the way that the brain is functioning with brain damage, sometimes those symptoms, even though they may indicate malingering, support a finding of, of schizophrenia or, or paranoia. And so, so, so to find, to, to, for the court to find that there was no mental disease or defect, the court did not assess all of the evidence that the defense desperately needed to put on. The defense was deprived of its ability to present its defense, which was that malingering, they, the, the expert neuropsychiatrist believed was belied by what he believed to be brain damage. And in fact, in the motion that was submitted to the court on, to get funding for neuropsychological evaluation, the defense attached a number of articles detailing specifically that issue. And I thank you for that question, because I think sometimes these things are, are confusing to us lawyers. Well, so, and, and it certainly is for me, because I'm not an expert in, in neuropsychology by any stretch, but help, help me to see the, the abuse of discretion that, that the district court committed in, with regard to this ruling, I guess, not the one that was in the subject of the ruling. Right. And I'm only arguing with regard to this ruling. Correct. Because I'm saying that this ruling would have changed the color of the case, right? It would have changed the outcome of the case, if indeed brain damage was found. But we don't know what the result of that testing would be, right? Remind me of your question, I'm sorry. But show me the abuse of discretion here. How did the district court? Okay. Abuse of discretion in denying this. The standard for granting defense funding is actually, pre-trial, pre-hearing, is actually simply that it is necessary for adequate representation. The district court denied the funding based in, on inapplicable standards. The inapplicable standard, the wrong legal standard, the district court said, was whether Mr. Porter was entitled to a neuropsychological evaluation where he had been evaluated by two prior doctors. And in support of that, the court cited Ape, which says that a defendant's entitled to a psychiatrist in a case. Well, the psychiatrist in this case needed neuropsychological evaluation. So that, in and of itself, was an abuse of discretion. Likewise, the court found the record for establishing the need for the expert was nascent and deferred the determination of the need to the evidentiary hearing. One doesn't need to prove that that funding will result in the outcome that you're trying to defend. The defense has to investigate that possibility. They are bound to do that. And, in fact, if they didn't, they would be found ineffective. And so when the district court said that they had only established a nascent need, well, nascent, according to Merriam-Webster, means coming or having recently come into existence. And defense counsel, in this instance, has to investigate a complete defense to the government's allegation that Mr. Porter was competent, has to investigate that as it's coming into existence. And, in fact, it's abuse of discretion to deny an indigent defendant the funds to be able to obtain that neuropsychological evaluation. One court has said is if this were a paying client and competent counsel would retain that evaluation, then the funding ought to be granted. That's one way to look at this. And I'm going to, unless there are other questions, reserve the remainder of my time. Thank you. All right. Thank you. Mr. Michael Fowler. Good afternoon, Your Honors. May it please the Court. I'm Mike Fowler. I'm representing Kevin Jackson, who I also represented at the trial. The three-week trial consisted of testimony and photographic evidence of 12 brutal and bloody acts of violence stretching from 2004 to 2011. It included seven murders, five attempted murders. My client was alleged to have been involved in just one of those murders, that of Jesse Reed, in mid-June 2009. He was not even tangentially involved in any of the other acts of violence. Our appeal focuses on the trial court's failure to grant a severance once sought before, during, and after the trial. Notably, prior to the filing of the third indictment, the superseding third indictment, Jackson was not named as a co-conspirator and was only named as such after he had moved for a severance. Thus, inclusion of him in the two conspiracy counts made permissible joinder under Rule 8B. But it did not, I submit, permit denial of a severance, which was clearly warranted as the government's evidence unfolded, as you will see when you look at the record. Kevin Jackson was charged in five counts, 1, 2, 3, 10, and 11. The jury acquitted him of three, namely the drug conspiracy charge in two, use of a firearm in connection with that conspiracy, count 3, and causing the death of Jesse Reed through the use of a firearm, count 11. The jury did convict him of aiding and abetting in Reed's murder, count 10, and in the overarching RICO conspiracy, containing count 1. Your Honors, a full review of the record makes compellingly clear that Kevin Jackson was severely prejudiced by the barrage of absolutely sickening evidence of the most horrible brutality that comprised the bulk of the government's evidence, murders in which Kevin Jackson was in no way involved, and that is by the government's own tacit admission. As we fully discussed at pages 6 through 10 of our reply brief, evidence of the murders of Darvin Bessie, Darnell Stewart, Hassan Williams, and James Matthews by Telly, Hankton, and Walter Porter would have been totally inadmissible if Jackson was tried alone. And as your predecessor, Judge Jolly, so clearly articulated in his opinion in U.S. v. McRae, no limiting instruction would, as required, compel the jury to quote-unquote compartmentalize the evidence solely bearing on Kevin's guilt on 1 and 10. Counsel, so I'm hearing you making this argument, but how does the fact that he was acquitted on what, three of the counts, I mean, doesn't that suggest the jury sorted the evidence and wasn't prejudiced? Not really. How so? It's still, you still have the overwhelming taint that convicted him of count one. The fact that he was acquitted of counts that, I don't even know why they were in the indictment. There was no involvement in a drug conspiracy except for the attempted suborn perjury of Washington McCaskill, which I think was addressed by a few minutes ago. But I do not think that the fact that there was, that the jury made some gruesome conclusions that were clearly warranted did not overwhelm, did not make the lack of a severance justified in any way. Simply stated, as in McRae, nothing the judge told him, nothing that he could do in a limiting instruction could cure the prejudice of the spillover effect from the mountain of horrible evidence the government used to convict Telly Hankton, Walter Porter, and Andre Hankton. We, your honors, I fully understand the court's longstanding preference for joint trials, especially in conspiracy cases, but this court recognizes, as it did in McRae, that rule 14A mandates a separate trial when substantial and compelling prejudice is apparent in a joint trial. We submit this is one of those relatively rare cases where a review of the lengthy trial record makes all too clear that severance was absolutely warranted in this case. Counsel, let me ask you what you think of this standard. We have case law that says defendants must isolate events at trial, demonstrate the events caused substantial prejudice from the lack of severance, and show how the jury's instructions were inadequate. That's a standard. I'm not asking your opinion of that. But if we look at this evidence and look at what your client was convicted of and decide, in fact, there was significant evidence of that guilt, where does that leave us on your argument for prejudice? I think there was not sufficient. Well, no. That's part of our analysis. I'm not telling you now. Well, I'll come to that in a second, your honor. That's a sufficiency of the evidence issue, not a severance issue. I'm sorry. It seems to me you may have a sufficiency of the evidence issue, but insofar as the severance issue, it seems to me that showing prejudice requires us to be convinced there's something about this trial that convicted your client of something for which there was insubstantial evidence. The only linchpin to the conviction is the sufficiency on count 10, the murder of Reed, which I'm coming to, and that's the linchpin to the Rico case. There is no other evidence. So we do deal with a sufficiency issue, which I suggest was never sufficient to convict on it beyond a reasonable doubt, if I may. Turning then to the government's evidence of Jackson's guilt on the count 10, which as I say is the linchpin to the conviction under Rico, contrary to the government's bald face assertions, and I don't make that accusation loosely, but contrary to their bald face assertions in the indictment and in the brief that Kevin Jackson quote unquote arranged and participated in the murder of Reed, that he was a quote unquote gunman for the enterprise, that he was a drug dealer quote unquote, these assertions are not only demonstrably false, but they are contradicted by the trial testimony as well as the jury's verdict. Fact, the jury acquitted Kevin of the drug conspiracy as well as the two charges of possession of a firearm. Fact, there was not a single shred of evidence that Kevin ever possessed a weapon. Fact, according to the government's own evidence, it was not Kevin, but Aaron Smith who arranged for Walter Porter to assist Telly Hankton in shooting Jesse Reed. Fact, the only direct evidence of the events surrounding Reed's murder was the sworn grand jury testimony of Hassan Williams, who was with Reed when the murder occurred. Hassan knew both Telly and Jackson and only identified Telly, not the third person in the car from which Telly and Walter Porter alighted when they started shooting Jesse Reed and shooting at Hassan as well. Hassan did not describe any crowd at the scene, contradicting the double hearsay testimony of a government witness that Porter said Telly's cousin Kev shot into a crowd. It is perfectly clear the government has intentionally and falsely equated Kevin Jackson with Telly's cousin. Telly had another cousin named Thomas Squirt Hankton. He's named in the indictment. It was this cousin, not Kevin, who the government charged along with Porter of killing Hassan a witness to Reed's murder, as well as the attempted murder of an innocent witness to Darnell Stewart's murder. We submit the only rational conclusion in terms of sufficiency, Your Honor, the only rational conclusion from the trial testimony is the third person in the car was not Kevin Jackson, but was Thomas Hankton, Telly's cousin who used a gun to murder Hassan Williams and who I said is the only witness to Reed's death. Most significantly, according to the government's own ballistic evidence, the two guns used by Thomas Hankton and Walter Porter to kill Hassan Williams match the ballistics of the weapons used to kill Reed. What's left of the government's proof? Only the multiple cell calls to Walter Porter in early June and on the evening of Reed's murder, plus the test. I think you're telling me I have just 20 seconds, Judge, just to sum up. Just 20 seconds, but yes, thank you. What we suggest is the calls without any content. There is no content to these multiple calls. There's no tape of, there's no conversation. It's just a record of calls. That and the severely impeached testimony of one witness, which Judge Feldman, with all due respect, commented upon his lack of credibility. That's the government's evidence. That cannot add up to guilt beyond the reasonable doubt on one, on count, excuse me, count 10, which as I say is the only thing that links him to the evidence on count one as well. Thank you. Thank you, Mr. Fowler. I appreciate the extra time you gave me. Thank you.  Thank you if we could all please rise for your argument. Thank you. Ms. Silia Rhodes. Who it is? May it please the courts, good afternoon, my name is Silia Rhodes with the Federal Public Defenders Office, and I represent Andre surveillant. Did you represent a trial? I did not, Your Honor. To reorient the court, though, Andre was the only defendant in this trial who wasn't accused of being a part of any RICO conspiracy or drug conspiracy. Instead, the case against him was based on two incidents, his participation in the murder of Darnell Stewart, who killed Andre's brother, and a traffic stop a year later when officers found an illegal shotgun. And thankfully, his appeal is easy to resolve. The government concedes that Andre's only two challenged convictions, two 924 counts, both should be thrown out. And that's because they were predicated on RICO conspiracy, which no longer qualifies as a crime of violence. Let me stop you there. They have conceded the RICO conspiracy issues. Is there any other issue regarding your client? Absolutely, because we dispute relief. So if the court doesn't have any questions about the underlying error of Davis, which I do think is straightforwardly dictated by precedent, I would love to jump straight to that relief issue. Do what you love to do. And the question there is whether this court should reverse entirely, ending the prosecution, or whether the court should allow a second trial. And I think thankfully, this court's decision in Miller directs exactly how to proceed in this circumstance. Our dispute comes from the fact that the government tried this case based on two predicates for those 924 counts.  One was the RICO conspiracy that's now invalid under Davis, and the other was the drug trafficking conspiracy. Now, the government is asking for a new trial so it can once again try to present its evidence on that same drug trafficking conspiracy. But Miller makes clear that because the evidence on that theory already was insufficient, this court should reverse rather than remand for a second chance. And that's the better practice, as Miller explains, because it prevents a defendant from having to face a second trial when the evidence on the first already was insufficient. So our dispute about the remedy for Davis error turns on whether the evidence for the drug trafficking predicate already was insufficient. And if this court agrees with us that it was insufficient, Miller counsels for reversal and acquittal. And I think that that sufficiency question is easy, too, because the government didn't prove two necessary elements, knowledge with respect to the underlying drug predicate and most importantly, intent to facilitate that drug offense through possession of a firearm. Count 8 in particular was based on the fact that in May 2008, Andre ran over Darnell Stewart with his car, after which Telly Hankton then shot and killed Stewart. And since hitting someone with your car generally will not qualify as a federal offense, the government had to charge Andre Hankton with aiding and abetting Telly Hankton's possession of a firearm during and in relation to a drug trafficking crime. That is a very specific mens rea requirement, and it's what confers federal jurisdiction for this offense. The firearm had to have some purpose or effect with respect to the specific drug trafficking offense. And for Andre, the alleged accomplice, that is exactly the same as for the principal. They had to prove that he both knew of and shared that specific intent. As Roseman put it, the accomplice's knowledge and intent must go to the specific and entire crime charged. Every single element of the underlying offense, meaning the gun use and the predicate drug trafficking crime. Now, with that framework in mind, this is a remarkably easy sufficiency question because there is no evidence whatsoever that Andre was involved with or even had any knowledge of that predicate drug trafficking conspiracy that was alleged in the indictment, much less that he specifically intended to facilitate that conspiracy on that night in May 2008. In fact, the only relevant evidence in the record was witnesses testifying that he killed Stewart because Stewart killed his brother and that his intent did not relate to drug territory. And the government doesn't argue otherwise. Instead, on pages 29 and 30 of their brief, the government urges to adopt a long chain of legally impermissible inferences that aren't even supported by the record. The government's argument essentially rests on three broad claims. First, many people knew Telly Hankton was a criminal. Second, some Hankton family members, though indisputably not Andre, sold drugs. And finally, many people knew that Telly Hankton had a conflict with Darnell Stewart. And of course, the government has no direct evidence or even any evidence suggesting that Andre specifically was privy to those things. So the government necessarily has to argue that everyone knew those things, or as the court has already known. Now, this line of reasoning, I hope it goes without saying, is not even close to proof beyond a reasonable doubt. At best, it's innuendo, mere suspicion of guilt. This court was clear in white, black-letter law. The government cannot base a prosecution on bits and pieces of evidence that add up to no more than ground for conjecture and suspicion. An inference has to be more than speculation in order to be reasonable. And certainly you can't pile inferences on top of each other the way the government has. We counted seven in our brief. And you can't call that proof, much less unreasonable inferences. And that is reaffirmed again and again in cases like McDowell, Ganji, Lombardi, rejecting arguments identical to this on way greater proof than what the government had in this case. And what makes this case unique, and actually an outlier among any cases that I've seen, is that there's not even anything defendant-specific about the government's argument. It applies equally to everyone. It sounds like anyone who helped Telly Hankton kill Darnell Stewart would have been automatically guilty of facilitating a drug trafficking conspiracy, too, because anyone necessarily would have, as the government puts it in their brief, known what they were getting themselves into. Even setting aside that problem, though, I would urge this court to closely examine the case. In addition to citing no evidence whatsoever relevant to Andre's knowledge of the drug conspiracy or his intent to further it, the government doesn't even support its claim that many of these facts were widely known. Instead, the government is citing to testimony of their own witnesses relaying what they knew. And of course the fact that a testifying co-conspirator has certain knowledge says nothing about whether that fact is widely known, much less that a particular defendant knew it. Even ignoring all of those problems, the government's reasoning still doesn't get it where it needs to go, which is proof that Andre acted with specific intent to facilitate a drug trafficking conspiracy by helping to kill Darnell Stewart. Not that he had some vague sense that Telly Hankton might have some unsavory motivation or was involved in criminal activity. Finally, the government's argument ignores the only evidence relevant to this question. Only three witnesses in this entire trial knew who Andre Hankton was. They testified he wasn't a drug dealer or a gang member. He was away for months at a time working on ships. And his tearmate, Alvin Neal, provided direct evidence of intent. Not conjecture, not suspicion, not even an inference. Andre told him he hit Darnell Stewart with his car because Stewart killed his brother. In fact, Neal specifically testified at record page 11169-70 that Andre's purpose was not related to drug territory, as the government now asks this court to assume. So under Miller, this court should determine that the government's evidence on the drug trafficking predicate already was insufficient and therefore order reversal with no opportunity for a new trial. Thank you. Thank you, Madam Clerk. May I hear a blast from Mr. Jeffrey McLaren. Thank you, Your Honor. May it please the Court, Ryan McLaren for the United States. I want to limit my argument to responding to four of the issues here. I don't anticipate that I'm going to take my full time, although obviously if the Court has any questions, I'm happy to answer them. I was wondering if you had a 40-minute argument. No, sir. I do not. Left to my own devices, I don't, although I'm happy to answer any questions. The four issues that I'd really like to spend some time on are the Davis concession, first. Second, because it was brought up, Telly Hankton's forfeiture by wrongdoing argument. Third, Mr. Porter's competency argument, and then finally the restitution orders. Starting with the Davis concession, it should go without my saying that this was not an easy decision for our office to make, in particular as to Andre Hankton. This is an individual who, there's really no dispute, brutally executed a rival in the middle of a busy street in New Orleans. However, we looked at this case, we looked at the evidence in this case, we reviewed this Court's decisions in Jones and in McLaren, which were two cases that also came out of our district, two gang cases that came out of our district. I have to say that if this case had happened first, we probably wouldn't, the concession wouldn't be here. We would have been fighting this. But after Jones and after McLaren, we just were left with no other option here, was our position on this, which is hence the concession. With the concession in place, the proper remedy here is to vacate the conviction and send this back down for a new trial that's consistent with every instructional error case that we've located, including Jones and McLaren, which were both Davis error cases, that's consistent with other instructional error cases, like Bailey cases, like the Nieder materiality cases dealing with mail-and-wire fraud. And you make to the argument we just heard as to why this is different. About the two predicates? I would say that this most closely with the other instructional error cases is probably like skilling, where there's the two theories of property, the honest services and money and other property, and the skilling cases, the remedy was. And skilling itself to send it back down for the possibility of a new trial under the correct theory. On top of that, this is, again, under the Davis umbrella of cases, something that this Court has seen previously in McLaren and in Jones, and in Jones in particular, sort of the controlling case on this issue within our circuit, is the remedy is this is instructional error. The remedy with instructional error is to send it back down. I have not located a single case from this circuit or anywhere else that says that a next step to do a sufficiency of the evidence review, and in fact, oh, I'm sorry. In the Davis situation? The Davis situation or any of these other instructional error cases. Predating Davis, even. He said you can't find. I have not found one, either skilling or Nieder or Bailey or whatever the other instructional error cases are. But in particular, I mean, again, this has been an issue that's been in front of this Court before, is what do we do with this Davis error present in these gang cases? And the remedy was to send it back down for a new trial under the correct theory. And to send it back for a new trial, depends on how he wrote it, if in fact, any of these defendants, Andre Hankin, wanted to argue the contrary, that's an issue that could be raised with the district judge, I suppose. Issue that can't be retried because of whatever the argument wants to be. I'm sorry. You want us to . . . well, I mean, you want us to foreclose, I would imagine, say that we are returning it for a retrial as opposed to just returning it to the district court in which this issue could be addressed. I think the specific language in Jones and McLaren was remanding it for further proceedings consistent with the opinion, but the upshot of that, my understanding is, for a new trial under the correct theory. So, in this case, it would be a new trial under the 924C in furtherance of the drug trafficking. Does that answer your question? Well, yes. But for further proceedings, it would seem to me to leave open, if that's what we say, any argument that any of the defendants wanted to make that retrial is foreclosed because of Davis. I think that it's not . . . it's that retrial would be foreclosed under the theory that a RICO conspiracy is a crime of violence, but I think the theory that the 924 could still be in furtherance of the drug trafficking conspiracy would still be fair game because it's not affected by Davis. But they could still make a . . . I'm sorry. Well, it's affected by Davis. Well, it's affected by any of the arguments that we just heard. We can either decide that now or decide that we don't need to decide that now. And if we use language as broad as you suggested, we turn to further proceedings, it sounds to me that we're not foreclosing anything, but . . . that was a comment, not a question. Do you have a question, Judge Wilson? No, I was clarifying what you were saying, which is to say that if we remanded for further proceedings, certainly the defendants could come in with a motion to say the evidence is insufficient. You can't proceed, whatever it may be, before you get to a trial. Well, we'd be back in a pretrial posture, and so I imagine, open up the possibility, I suppose for Rule 12 filings, it kind of depends on . . . just go back to the pretrial posture. So I suppose it depends on the scheduling order or whatever gets done below. But that would be my understanding. Why don't you move on? That's good enough. Thank you. The second thing I wanted to talk about was the Telle-Hankton forfeiture by wrongdoing issue, just because that has come up today. Judge Wilson, you had asked about the standard that is applied both at the district court and at the appellate level. My understanding is that the district court, it's the preponderance standard, that that is in the rules of evidence itself, to use the preponderance standard, and also was reaffirmed in Giles. On appeal, I think you had said clear error. My understanding is that it's an abuse of discretion issue, with this forfeiture by wrongdoing standard and whether it applies, whether the evidence should be admitted under it. Well, I think what I was getting at, I guess, is the evidentiary ruling, whether it comes in or doesn't, would be, I guess, abuse of discretion. But what about the underlying finding that there's a preponderance of the evidence that there was wrongdoing? Right. I understand. Are there evidentiary findings there that we are giving clear error deference to? I suppose that there is some questions of fact as to, for example, to the extent that this court wants to look at some of the trial testimony, this court obviously can affirm for any basis supported by the record. So there's a clear error-ish component of that, the extent that you want to look at the witness testimony. But right, I would agree with that to the extent that there's factual information that's involved here. A couple of things about the forfeiture by wrongdoing standard. As I mentioned, this court can affirm for any basis supported by the record. And also, there is a harmlessness component to this. And there's two pieces of evidence in particular that I'd want to direct you to for the harmlessness aspect of this and also for the witness testimony that further shows that this was a forfeiture by wrongdoing scenario. There's a testimony by Aaron Smith at ROA 11274 that Porter told him that he killed Williams because he was a witness and that Porter was going to keep killing in order to get Telly Hankton out of prison. That's obviously testimony that shows that, you know, why Porter did this and Telly Hankton's involvement in it. But then on top of that, sort of the upshot of this Hassan Williams statements that came in was that Telly Hankton was the person who shot Jesse Reed. That's sort of the import of this. And there's other pieces of testimony that came in and made that point very clearly. For example, there's a testimony of Brian Hayes at ROA 11694 and ROA 11710 that, for the quota's five racks, so $5,000 in order to kill Jesse Reed. There's other examples that we outline in our brief that make it very clear that Porter was there. Porter was the one who was doing the Reed shooting along with Telly Hankton. Moving on, the third issue that I'd like to talk about is the Porter competency proceeding. We agree, it seems like the direction of this argument today is that most of this is foreclosed. We threw out a number of legal theories as to why this is foreclosed in our brief. I think that the two, honestly, that applied the most are probably estoppel and also stare decisis. This is based on the same facts, the same law, so on and so forth. I'm sorry, Judge. I must have breathed too strongly. And so, I'm used to talking on Zoom and having to try to preempt that a little more. As to the issue of the psychological testing, I think it's important to look at the information that was before Judge Feldman and Judge Vance here and what the psychological testing possibly could have informed. Judge Feldman and Judge Vance, they did this competency hearing together. They were on the bench at the same time. They signed orders together. This is all background information that this court went over in its previous published decision on Porter's competency. And the information that they had in front of them from both experts are things that, like, Porter was perseverating, that he was difficult to direct, that he likes to interrupt. Also that he, the malingering issues that this came on kind of late in Porter's life in a way that's atypical of these other types of cases. All that is information that was in front of the district court. The most that the psychological testing would have said in this case is kind of background explanation as to why Porter is the way he is. It, you know, he perseverates possibly because he has brain damage. He is difficult to direct possibly because he has some kind of neurological condition. The underlying facts that Judge Feldman and Judge Vance based their findings on, that he perseverates, that he is difficult to direct, those don't change with the neuropsychological testing. All it does is give some kind of explanation as to why those facts are the way that they are. But is the explanation important? I mean, does it inform the competency determination in a way that it, you know, it should have been allowed? I just don't see how it would have moved the needle at all for the district court in this case because, again, it doesn't change those underlying facts. For example, Dr. Agarkar, the defense expert, he already said, I believe that Porter is incompetent for these reasons. It's not like it was an issue that was left open as to, is he incompetent, is he not? I don't have enough information in front of me. But does having the neuropsych evaluation before the competency hearing allow the defense to take a different direction or be, present the case in a new light? Again, just looking at the information that was before Judge Feldman and Judge Vance, I just don't see how much more information or how much more shoring up was necessary here. They had quite a lot of actually monitoring of Porter. They have the two experts' reports about him. And again, the defense expert, it's not as if Dr. Agarkar was saying, I just don't know what to make of this. He was saying, here's what I, here's what I see. And I believe that he is incompetent. So the two district judges here really had a lot of information in front of them to base this on. Did any of those experts say a psych eval would give me a better understanding or potentially more informed explanation of what's happening? I believe that Dr. Agarkar, that the reason it was put forward why this was necessary was again to kind of explain kind of why Porter is the way that he is. I don't know that I've seen anywhere it explained how that would have affected any of these other findings. I'm asking if any of the witnesses who testified, did they state such an examination would allow me to do X? And if so, what's X? I don't know that that was ever explained that way. That, you know, district judges, Judge Vance, Judge Feldman, you're really missing out on an explanation here. Here's what we intend to actually, you know, move the needle and kind of redirect this in a different way. The last thing that I wanted to talk about, and of course if the court has any questions, is the restitution orders. I did want to bring it up because based on my research, this would be a new ruling for this court to say that a RICO conspiracy does not trigger the Mandatory Victim Restitution Act. The law leaves open the possibility for a conspiracy or other kind of inchoate-ish in nature crimes, like a scheme to defraud, to have victims that can be the beneficiaries of restitution orders. However, just kind of the way that the Mandatory Victim Restitution Act is written, it incorporates Section 16's definition of a crime of violence. And sort of a natural extension of Jones and McLaren is that a RICO conspiracy cannot be a crime of violence under Section 16. So we would ask that the court, you know, limit its ruling somewhat, again, this being kind of a new rule here, that a RICO conspiracy cannot trigger liability under the Mandatory Victim Restitution Act, and instead send Telly-Hankton's restitution order in particular back down to the district court for a new restitution finding. Unless there are any other questions? So the problem there is the same problem with the 924 convictions? Essentially yes. The specific problem with the MVRA is that it explicitly incorporates Section 16's definition of a crime of violence. So it's a little different. It's not just sort of this, yes, it's essentially the same. I mean, basically we can't tell if the restitution order is based on a crime of violence or not a crime of violence. Is that? So it's a little different from the instructional error in that respect. Judge Heldman was very clear in the restitution order that the MVRA says Section 16. I find that the RICO conspiracy here was a crime of violence for purposes of Section 16. So it's a little more cut and dry than some of the instructional error stuff, but it's the same type of error. A RICO conspiracy not being a crime of violence over here means that it's also not a crime of violence over there. Does that answer your question? I think so. Okay. Helpful. Unless there's any other questions. Thank you. Thank you. This concludes our argument on the first case, so we'll call these, oh, I'm sorry, you're having a problem. Oh, just briefly, Your Honor. Yes, we are. You're all having a problem. I'm sorry. Thank you. Ms. Schimm. Did I get that right? Yes. Yes. So I'll just address returning to the forfeiture by wrongdoing, admission of prior testimonial statements by Hassan Williams. I just want to address the harmless error aspect of this, which is really the statements of Hassan Williams identifying Telly Hankton as a shooter of Jesse Reed. That is the only direct evidence we have in this case connecting Telly Hankton to the shooting of Jesse Reed. The testimony that was referred to by the government, the testimony of Aaron Smith, Brian Hayes, there's others, Jared Feddison, they do testify about the killing of Jesse Reed, but again, they give you hearsay statements of Walter Porter. And as I was kind of trying to refer to earlier, we can draw some conclusions about what the jury thought about the statements of Walter Porter. Again, look at counts 15 and 16. The jury found that Telly Hankton was not guilty of counts 15 and 16, charging him with the shooting of John Matthews. And these same witnesses, Aaron Smith, Brian Hayes, they give this testimony, statements of Walter Porter, where Walter Porter told me that Telly Hankton hired him to shoot John Matthews. So we know when these statements stand alone, the jury doesn't buy it. So we can say that this error, the erroneous admission of these statements, if you didn't have this evidence in trial, there is definitely a reasonable possibility that the jury would not have come to the same result in the Jesse Reed killing. And finally, just to conclude, I do want to say that the jury in this case really was competent and capable of applying the law as it was given to it by the judge. The jury was really able to assess the evidence and apply it to each defendant as it saw fit. But the jury in this case did not get the chance to do what we ask juries in this country to do. The jury didn't get a chance to look at the government's evidence and apply serious adversarial testing to the government's evidence, let Telly Hankton put on his full defense, and then the jury can look at the government's case and the defense's case and decide where the truth lies. That didn't happen in this case. And that's why we know we have an unreliable result, and we respectfully request that this court remand for a new trial in this case, unless there are any other questions. All the best. Thanks, counsel. Thank you. Thank you, counsel. Ms. Lautinger? Thank you. I'd just like to revisit the government's, what I would say, mischaracterization of the funding for a neurological evaluation as a competence claim. Competence was, in fact, determined in the trial court, and using an abuse of discretion standard, another panel of this court said it did not find an abuse of discretion, a very different standard, by the way, than the analysis that would happen at the district court level. This is a right to present a defense claim. It is a straight-up Sixth Amendment claim. It is a claim that an indigent defendant is entitled to funding to present a defense, and this expert was necessary to Mr. Porter's defense. Counsel, what about the government's statement that this wouldn't have really furthered the analysis, it might have explained the background? So, therefore, it wasn't necessary? Well, the court found no mental disease. So, that was based on malingering. If malingering could have been rebutted, I see no way that the government can argue that that wouldn't have rebutted one of the grounds of the district court's opinion, that Mr. Porter was incompetent. There was no . . . Did any of the experts who testified or were involved in the competency hearing say, we need a neuropsych evaluation because? Yes. In the motion that was made, the neuropsychiatrist, the defense neuropsychiatrist said that Mr. Porter presents with classic signs of brain . . . The experts who were involved, did anybody . . . I mean, you heard the exchange between us and the government's counsel about whether anybody who was involved said, you know, there's a hole here, there's a gap, we would really need the neuropsych evaluation because.  Anyone other than the experts? Anyone that was already considered in the competency hearing? Well, I can say that one of the things we argued was that the court never considered testimony of defense counsel. And I will say consistently, in this case, from the get-go, from very experienced defense counsel, and I think I've added it up to about 170 years of defense experience, has said that Mr. Porter is simply incompetent. This court has letters before it that he's filed with the court, and they are incomprehensible. And as you know, I filed a motion asking to remand for a determination of competence on appeal. He is incompetent. That's based on 33 years of trying to speak with clients about cases. He's incompetent. Thank you, counsel. But the claim is the deprivation of the right to present a defense. Thank you for your argument. Thank you. Thank you. Ms. Rhodes? Thank you, Your Honor. I'm a little bit surprised by the government's argument. I think a plain reading of Miller says explicitly, it's accordingly the better practice of the appellate court on the initial appeal to dispose of any claim properly presented that the evidence of trial was insufficient. The reason for that is if this court ignored all of our trial defect arguments and reached only sufficiency under Burke's, acquittal would be mandated. And so Miller says courts should reach that claim as well, to say, would a properly instructed jury have been able to acquit? Miller includes a survey of circuit law. As far as I can tell, all other circuits agree. Last I checked, I believe there are about 250 citing references to Miller, including cases that we cited in our brief. I think Williams is a good example, 9-8-F-2nd-749. They go through the instructional error and say, now, pursuant to Williams, we will examine whether a properly instructed jury could have found guilt beyond a reasonable doubt. For one defendant, the answer was yes, so it was a new trial. For the other two, no, so it was acquittal. Kuzminski and the Supreme Court does the same exact thing. And the reason for that is that the government would get a windfall otherwise. They would get a trial overturned on a technicality when they failed to prove guilt. They presented this theory. They charged this theory. They say their evidence is sufficient. They presented all their evidence. So this court now can reach that question now and avoid the trouble and the double jeopardy implications of subjecting someone to a new trial a second time when we already know that the evidence was insufficient. I also debated bringing this up, but I think I have to have candor with the court. Under Miller, without conceding anything, I don't believe we would be able to bring a double jeopardy motion below. Now, the government apparently believes that we can, and so we hope to hold them to that in the event this court remands. But under Miller, the reason for this practice, for the initial panel to reach the sufficiency claim, is that the appellant will then be foreclosed. And so Andre Hankton will be sitting in jail. He's already been in jail three years over his maximum sentence. He will continue to be detained. We will have a second superfluous trial when, as Miller points out, the initial panel could have just said from the onset, the evidence was insufficient. He should have been acquitted. So for that reason, we would ask that the court reverse and enter a judgment of acquittal. Thank you. Thank you, Ms. Sherwood. Pardon?